**\*\*NOT FOR PRINTED PUBLICATION\*\***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| ASAMARBUNKERS CONSULTADORIO E | § | |
| PARTICIPACOES UNIPESSOAL LDA | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION No. 1:10CV223 |
| | § | |
| v. | § | |
| | § | JUDGE RON CLARK |
| UNITED STATES OF AMERICA ET AL; | § | |
| | § | |
| *Intervenor Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| WILHELMSEN SHIPS SERVICE, INC., | § | |
| | § | |
| *Claimant*, | § | |
| | § | |
| v. | § | |
| | § | |
| NEW RIVER M/V, its engines, tackle and | § | |
| apparel, in rem; THE BUNKERS ABOARD | § | |
| THE M/V NEW RIVER, and those in interest | § | |
| therein, in rem; and AHL SHIPPING | § | |
| COMPANY, in personam | § | |
| | § | |
| *Defendants*, | § | |

## ORDER GRANTING IN PART UNITED STATES'S MOTION FOR SUMMARY JUDGMENT

This case is an in rem action involving competing claims against the vessel the M/V New

River.  The United States moves for summary judgment [Doc # 107] declaring it is the holder of

a preferred mortgage on the M/V New River and therefore, its lien is senior in priority to all

claims, except for custodia legis expenses, against the defendant vessel.

Asamarbunkers Consultadorie e Participacoes Unipessoal Lda ("Asamarbunkers")

opposes the United States's motion based on the Maritime Administration of the United States

Department of Transportation's ("MARAD") alleged misconduct.  Asamarbunkers asserts that

MARAD knowingly permitted the insolvent shipowner AHL to continue accruing debts which it

knew AHL could not pay; therefore, the United States's preferred ship mortgage should be

equitably subordinated to its lien for necessaries.  Intervenor Plaintiff Captain Timothy A.

Brown asserts that contributions AHL owed to the seamen's IRA and Vacation Plans are wages

of the crew and therefore have priority over the United States's preferred ship mortgage.[1]

After reviewing the summary judgment record and taking all facts in the light most

favorable to the non-movants, the court finds the application of equitable subordination

unwarranted and therefore, grants summary judgment in favor of the United States as to

Asamarbunkers's claims for necessaries.  The  court further finds that unpaid contributions to the

seamen's IRA Plan are not wages of the crew while those owed to the Vacation Plan are wages.

---

[1] The other parties named in the suit, Intervenor Plaintiffs Citgo Petroleum, Suderman & Yong Towing Co., Millennium Maritime Inc., Costas Georgas, have been dismissed from the case.  While Claimant Wilhelmsen was never dismissed from the suit, Wilhelmsen's sole claim was for gas cylinders onboard the M/V New River.  On November 12, 2010, the court granted Wilhelmsen's motion to remove the gas cylinders from the vessel. [Doc. # 73].  A garnishee was also originally named in this case.  According to the complaint, a Garnishee includes "entities which, by information and belief whose regular business includes the husbanding of the Vessel at the Port of Beaumont (Moral Gulf Agencies and/or Moran Agencies), may owe Accounts to defendant and otherwise hold other property of defendant.  Garnishees also are the Mater of the Vessel, who controls the Vessel and property of defendant aboard the Vessel, including bunkers (not purchased from plaintiff)(herein collectively, "Property") and others who or which may hold property of defendants" [Doc. #1 at 6-7].  As the garnishees have not filed claims, they are not actually parties in this case.

2

Accordingly, the court grants summary judgment in favor of the United States as to Captain Brown's claim for contributions owed to the IRA Plan but denies summary judgment as to contributions owed to the Vacation Plan.

## I. BACKGROUND

The vessel M/V New River was one of four oil tankers rebuilt by AHL Shipping in 1995. The financing for this project was through bonds guaranteed under Title XI[2] by the MARAD issued under a trust indenture and sold to the public by an investment bank. As part of the financing, AHL executed a promissory note in favor of the Secretary of Transportation and a First Preferred Fleet Mortgage was placed on the four vessels, with the United States represented by the Secretary of Transportation acting by and through the Maritime Administrator, as the mortgagee. Payments were due semi-annually on December 1 and June 1 of each year.[3] On October 3, 1996, the First Preferred Fleet Mortgage was duly recorded with the United States Coast Guard.

On October 22, 2009, AHL's attorney wrote MARAD that AHL could not make the December 1, 2009 bond payment and requested that MARAD pay the principal and AHL would pay the interest. On December 18, 2009, before MARAD could formally accept AHL's request, AHL advised MARAD that it was unable to pay the interest on the December 1, 2009 bond payment and requested that MARAD pay both the principal and interest. MARAD subsequently notified AHL that its request was denied. AHL never made the required bond payment.

---

[2]*See* 46 U.S.C. § 53701 et seq.

[3]Payments were originally due semi-annually on May 15 and November 15 of each year, however, later endorsements changed the date to December 1 and June 1. *See e.g.* Supplement No. 5 to First Preferred Fleet Mortgage [Doc. # 6-14 at 12-13.]

Accordingly, default occurred on December 1, 2009[4] and on January 24, 2010, the indenture trustee made his demand[5].  On February 24, 2010, pursuant to the guarantee, MARAD paid off the entire outstanding balance and accrued interest.

On April 15, 2010, acting on MARAD's behalf, Keystone Shipping assumed custody of the M/V New River in Port Arthur, Texas.  The vessel was arrested on April 23, 2010 and sold at an in rem sale by the United States Marshal's Service on January 11, 2011, for $2,800,000.000.  On June 18, 2010, AHL filed for bankruptcy.  On August 23, 2010, the bankruptcy court entered an order abandoning the estate's interest in the M/V New River.

Intervenor Plaintiff United States of America seeks to recover $91,043,890.31 plus interest owing on the preferred ship mortgage.  Intervenor Plaintiff Asamarbunkers asserts a maritime lien against the New River in the amount of $1,136,567.71 for fuel provided to the vessel on February 20, April 1, April 9, 2010.[6]  Intervenor Captain Timothy A. Brown, Chairman of the Board of Trustees of the Masters, Mates & Pilots's Individual Retirement Account Plan and Vacation Plan asserts a claim for unpaid contributions owed to the Plans by AHL.

---

[4]Asamarbunkers alleges that default actually occurred on October 22, 2009, when AHL notified MARAD that it could not make the required payments.  In support of this proposition, they cite to Section 6.01(b)(5) of the Security Agreement which provides that default occurs when the shipowner becomes insolvent or bankrupt.  Asamarbunkers alleges that AHL's communication to MARAD was an admission of insolvency.  The court, however, does not agree.  Payment was not due until December 1, 2009.  AHL had until this date to make the payment.  Despite AHL's cash flow problem, the company had not yet declared bankruptcy and still could have received alternate funding.

[5]See 46 U.S.C. 53721(a) providing that if an obligor has continued in default for 30 days in the payment of principal or interest, the obligee may demand that the Secretary or Administrator pay the unpaid principal and interest amount on the obligation.

[6]Asamarbunkers began supplying AHL with bunkers for its ships in December 2009.

4

## II. SUMMARY JUDGMENT STANDARD

A party may move for summary judgment on all or part of a claim.  Fed. R. Civ. P. 56(a).  A motion for summary judgment should be granted when, after considering all the materials in the record including pleadings, discovery, and affidavits, "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).

The party moving for summary judgment under Fed. R. Civ. P. 56 has the burden of demonstrating that no material fact issue exists.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986).  If the moving party meets this burden, then the non-moving party must bring forth affirmative evidence in order to defeat the summary judgment motion.  *Id.* at 257.  The non-moving party, "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).

Only a genuine dispute over a material fact—a fact which might affect the outcome of the suit under the governing substantive law—will preclude summary judgment.  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  The dispute is genuine if the evidence is such that a fact-finder, utilizing the proper evidentiary standard, could render a decision in the non-moving party's favor.  *See id.* at 255, 106 S. Ct. at 2514.  In determining whether there is a genuine issue for trial, the court must view all facts and the inferences to be drawn from them in the light most favorable to the non-moving party.  *Matsushita*, 475 U.S. at 587, 106 S. Ct. at 1357.

## III. DISCUSSION

### 1. Priority of Maritime Liens

Asamarbunkers asserts a lien for fuel provided to the vessel, a claim classified as a lien for necessaries[7].  Asamarbunkers does not dispute that the United States's mortgage satisfies the statutory requirements of a  preferred mortgage under the Ship Mortgage Act, 46 U.S.C. 31301 *et seq.*  Pursuant to 46 U.S.C. §  31326(b), the United States's preferred mortgage has priority over Asamarbunkers's lien for necessaries.  Asamarbunkers, however, urges the court to apply the doctrine of equitable subordination and resolve the priority dispute contrary to the statutory scheme.

### 2. Asamarbunkers's  claim of equitable subordination

### a. Denial of the United States' motion is not an appropriate discovery sanction

Before making its argument for equitable subordination, Asamarbunkers argues that because MARAD failed to fully and adequately respond to discovery requests, the court should deny the United States's Motion as a sanction for MARAD's conduct.  The court does not believe that this type of sanction is appropriate in this case.

Fed. R. Civ. P. 37(b)(2) permits a district court to sanction a party that fails to obey an order to provide or permit discovery.  However, in reviewing a court's exercise of discretion under Rule 37, the Fifth Circuit considers whether a less drastic, but equally effective, remedy could have been fashioned.  *Jones v. Louisiana State Bar Ass'n*, 602 F.2d 94, 97 (5th Cir. 1979).

On April 19, 2010, Asamarbunkers filed a Freedom of Information Act request with MARAD.  MARAD, however, did not produce the documents until September 7, 2011.  Even

---

[7]Necessaries include supplies and towage.  *See* 46 U.S.C. § 31301(4)

when the documents were produced, a number of the documents requested were not included in the production and approximately half of the documents were heavily redacted. As a result, the court granted Asamarbunkers three extensions of time to file a response to the United States's Motion for Summary Judgment. The court also ordered the United States to produce the requested documents by November 18, 2011, at 5 pm. [Doc. #116].

The court understands Asamarbunkers's frustration with MARAD's delay in producing the requested documents. However, at no point during this delay did Asamarbunkers file a motion to request sanctions for MARAD's discovery violations. There is no dispute that MARAD finally produced the requested documents by November 18, 2011 in compliance with the court's order. Asamarbunkers can show no harm caused by MARAD's violations—the court granted all three of its motions for extensions of time to file a response. Asamarbunkers's request for sanctions at this late stage is presumably a tactical maneuver. The court will not deny the United States's motion for summary judgment on this basis.

**b. Equitable subordination is not warranted**

*i. Applicable Law on Equitable Subordination*

Equitable subordination is a concept that has frequently been used in bankruptcy cases. The Supreme Court has recognized that "[i]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 307-08, 60 S. Ct. 238, 245-46 (1939). The Fifth Circuit has held that this principle is also applicable in admiralty actions. *See Custom Fuel Services, Inc. v. Lombas Industries*, 805 F.2d 561, 565 (5th Cir. 1987)(stating "[t]he power of an admiralty court to scrutinize the

underlying validity of liens and mortgage claims is of ancient origin and derives from the court's
historic equity jurisdiction.)

Three conditions are necessary to justify the equitable subordination of an otherwise
valid claim:

1) the claimant must have engaged in some type of inequitable conduct.

2) the misconduct must have resulted in injury to the creditors or conferred an unfair
advantage on the claimant; and

3) equitable subordination of the claim must not be inconsistent with statutory provisions

*Id.* at 566.  After reviewing the summary judgment record in the light most favorable to
Asamarbunkers, the court does not find that the prerequisites to justify equitable subordination
are met in this case.

*ii. Burden of Proving Equitable Subordination*

Asamarbunkers does not dispute that the United States has a preferred ship mortgage.
Pursuant to 46 U.S.C. §  31326(b), the United States's preferred mortgage lien has priority over
Asamarbunkers's lien for necessaries.   Accordingly, Asamarbunkers has the burden to show that
a genuine issue of material fact exists on the issue of equitable subordination.  *See Anderson v.
Liberty Lobby, Inc.*, 477 U.S. at 257 (1986)(providing if the moving party meets its burden, then
the non-moving party must bring forth affirmative evidence in order to defeat the summary
judgment motion.)

Asamarbunkers alleges that there are several genuine issues of material facts including
the fact that AHL was on MARAD's Credit Watch List as a high risk borrower since 2004.
Asamarbunkers also calls into question MARAD's assertion that the United States could not

8

foreclose on its mortgage because it was unable to locate the vessel for more than four months. [8] However, only a genuine dispute over a material fact—a fact which might affect the outcome of the suit under the governing substantive law—will preclude summary judgment. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.   Even if all of the facts alleged by Asamarbunkers are true, they fail to satisfy the first element necessary for the court to impose equitable subordination, inequitable conduct.  Without inequitable conduct by the United States, the request for equitable relief must fail as a matter of law.

*iii. There is no evidence of inequitable conduct because MARAD did not control AHL*

The Fifth Circuit has expressly stated that the prerequisite to a finding of inequitable conduct is a showing that the claimant is in a position of control over the debtor.  *Custom Fuel*, 805 F.2d at 566.  Although the Court did not define control in the context of equitable subordination, the opinion indicates that to warrant the remedy, there "must be a substantial level of dominion over the debtor."  *See United States v. Pride of Texas*, 964 F. Supp. 986, 990 (E. D. Va. 1994)(discussing the Fifth Circuit's opinion in *Custom Fuel*).  In finding inequitable conduct in *Custom Fuel*, the Fifth Circuit specifically analyzed the degree of control exercised by the mortgagee:

> The record clearly shows that the Bank [whose preferred mortgage was at issue] controls the Subsidiary.  The Bank owns all its stock and controls its board of directors.  The

---

[8]The United States supports its assertion with the declaration of Daniel Ladd, a financial analyst employed by MARAD.  Asamarbunkers allege that the "United States has failed to produce or refer to a single document in support of [Mr. Ladd's] statements." [Doc. #117 at 6]. Asamarbunkers's sur-reply even requests that the court strike the declaration because his deposition testimony shows the declaration is not credible. [Doc. # 119 at 5-6].  Even assuming the court were to strike Mr. Ladd's declaration, the United States does not have the burden to disprove equitable subordination.

Subsidiary has no employees of its own . . . The Bank caused the Subsidiary's directors

to approve the "purchase" of the vessel and grant the Bank a mortgage in return

*Custom Fuel*, 805 F.2d at 566.

The creditor-mortgagee in *Custom Fuel* was a parent corporation and the debtor-

mortgagor was the subsidiary.  In contrast, there was no such control in the relationship between

MARAD and AHL.  AHL acquired the funding for the construction of the M/V New River

through the Title XI program of the Merchant Marine Act. Title XI of the Merchant Marine Act

is a federal loan guarantee program administered by MARAD.  *See Kirby Corp v. Pena*, 109

F.3d 258, 261 (5th Cir. 1997)(interpreting former 46 U.S.C. § 12771 *et seq*. currently cited as 46

U.S.C. § 53701 *et seq*.).  Under the Title XI program, a ship owner finances vessel construction

in the private market by issuing bonds or other indebtedness backed by federal guarantees

supported by the full faith and credit of the United States.  *Id.* To protect its financial interests in

the program, the federal government—after approving a loan guarantee for a prospective

vessel—acquires a security interest in the vessel.  *Id.* If the vessel owner subsequently defaults

on the loan, the government may either cure the default and assume the loan obligation or pay

the entire principal and interest due, **and then** foreclose on its security interest in the vessel. *Id.*

Essentially "Title XI creates a "triangular" system of *contractual relationships*."  *U.S. v.*

*Texarkana Trawlers*, 846 F.2d 297, 301 (5th Cir. 1988)(emphasis added).  Accordingly, the

relationship between AHL and MARAD was nothing more than a contractual, debtor-creditor

relationship.[9]

---

[9]Asamarbunkers alleges in its response that "[b]ased on the United States' limited
production, and without the benefit of deposing key players at MARAD, there are material facts
at issue which preclude summary judgment as a matter of law." [Doc. #117 at 1].  However,

*iv. MARAD's right to foreclose upon default without legal process does not create a relationship of control*

Asamarbunkers contends that the language in the mortgage documents stating what constitutes a default[10] and providing upon default, the Secretary "shall" have the right to take the vessels without legal process[11], is significant to the issue of equitable subordination.  According to Asamarbunkers, "The explicit terms of the Mortgage show that the Vessel *clearly came under the control of the government* upon the 'late 2009' default under § 6.04 of the Security Agreement ... [which] provided for immediate seizure of AHL's vessels—'without legal process'—upon default." [*See* Asamarbunkers Response Doc. # 117 at 15](emphasis added).  Asamarbunkers cites to *Gulf Oil Trading Company v. Creole Supply*, 596 F.2d 515 (2nd Cir. 1979), in support of its argument.

In *Gulf Oil*, Chase Manhattan Bank was a preferred ship mortgagee holding a foreign mortgage.  Pursuant to former 46 U.S.C. § 951, a preferred mortgage lien on a foreign vessel was subordinate to maritime liens for repairs and necessaries performed or supplied in the United States.  Realizing that foreclosure in the United States would result in subordination of its claim, Chase delayed foreclosing on the vessel while it was in the United States.  Instead, Chase arranged for the purchase of sufficient fuel for the vessel to reach the Bahamas where a

---

nowhere in its response or sur-reply does Asamarbunkers suggest that further discovery would produce evidence of MARAD's control over AHL nor does Asamarbunkers request another extension of time to complete necessary depositions. Furthermore, the court cannot contemplate how more discovery would illustrate that the Title XI arrangement is one where MARAD exercises control.

[10]*See* Section 6.01 of the Security Agreement [Doc. #6-8 at 27-28].

[11]See Section 6.04 of the Security Agreement [*Id*. at 29]

foreclosure sale would preserve the priority of its mortgage.  At the time this action was taken, Chase had complete control of the accounts of the shipowner, releasing funds as needed to carry on the ship's business.  In applying the doctrine of equitable subordination, the court specifically discussed the bank's control over the ship owner: "Chase, which now controlled the vessels for all practical purposes, permitted them in these circumstances to leave the United States."  *See Id.* at 519.

The present case is distinguishable from the facts in *Gulf Oil*.  Here, MARAD did not control the accounts of AHL.  Rather, the agency simply monitored AHL's financial situation pursuant to 46 U.S.C. § 53712(a) as it must for each loan made under Title XI.  That statute provides that should the ship owner's financial condition deteriorate, the Secretary or Administrator should take measures necessary to protect its interests.  The statute, however, does not provide MARAD with the right to control the shipowner. It states no deadline for action to be taken.  Importantly, given the timing of this case, the statute does not provide that foreclosure must occur immediately upon default or that ownership and control passes to MARAD when default occurs.[12]

Even though the mortgage documents provided MARAD with the right and power to foreclose as soon as AHL defaulted, this is not synonymous with a duty to foreclosure or with a right to control—an element which was present in *Gulf Oil*.  Absent control over AHL, MARAD did not owe subsequent lienors a duty to foreclose as soon as possible. *See The Favorite,* 120

---

[12]On February 24, 2010, MARAD paid off the outstanding balance and accrued interest on the bond payment.  Asamarbunkers supplied the vessel with fuel on February 20, April 1, and April 9 of 2010.  On April 15, 2010 Keystone Shipping assumed custody of the vessel and on April 23, 2010 was the vessel arrested.  Accordingly, MARAD did not have control of the vessel when Asamarbunkers supplied it with fuel.

F.2d 899 (2nd. Cir. 1941)(stating the Ship Mortgage Act "contains no requirement that, in order to preserve the preferred status of such a mortgage the mortgagee must foreclose at maturity or within a reasonable time thereafter, or indeed at any particular time); *See also West of England Ship Owners Mut. Protection & Indem. Ass'n. (Luxembourg) v. Patriarch Steamship Co.*, 491 F. Supp. 539, 546 (D. Mass. 1980)(holding absent false or misleading representations made to subsequent lienors, the "mere failure of the Bank to foreclose on a ship mortgage in default [even though it knew the vessel was operating at a loss] does not deprive the mortgagee of its preferred status").

Here, MARAD waited less than five months from the date of default before filing a motion to arrest the vessel on April 21, 2010. The court does not believe that MARAD's failure to foreclose within that five month period, absent a relationship of control, justifies applying the doctrine of equitable subordination.

### 3. Captain Timothy A. Brown's Claims for Unpaid contributions

The United States seeks priority lien status over the claims of Intervenor Plaintiff Captain Timothy A. Brown. Captain Brown, Chairman of the Board of Trustees of the Masters, Mates & Pilots' Individual Retirement Account Plan and Vacation Plan, asserts that contributions owed by AHL to the Plans are seamen's wages and thus pursuant to 46 U.S.C. § 31326(b) are entitled to priority over the United States's preferred ship mortgage.

Pursuant to 46 U.S.C. § 31326(b) seamen's wages have priority over a preferred ship mortgage. The court recently analyzed the Vacation and IRA Plans at issue in this case. *United States of America v. SS Captain H.A. Downing, et al.*, - -F. Supp.2d- -, 2011 WL 6016443 (E.D. Tex. December 1, 2011). In *Downing*, the court dealt with a priority dispute between a MARAD

13

preferred ship mortgage and Captain Brown's claim for unpaid contributions owed to the Plans. The court concluded in *Downing* that unpaid contributions owed to the Vacation Plan were wages of the crew while those owed to the IRA Plan were not wages of the crew.  Except for the names of the seamen and the amounts requested, the parties in this case have presented the same facts and arguments as those made in *Downing*.   Accordingly, the court grants the United States's motion for summary judgment as to the IRA Plan but denies the motion as to the Vacation Plan.  Although Captain Brown did not move for summary judgment in this case, because the facts and issues in this case are identical to those discussed in *Downing*, the court will award Captain Brown the sum of  $104,589.76, the amount AHL owed to the seamen's Vacation Plan.  *See* Fed. R. Civ P. 56(f)(1)[13].

### IV. CONCLUSION

For the reasons discussed above, the court grants the United States's motion for summary judgment [Doc. # 107] as to all claims except Captain Brown's claims for unpaid vacation contributions.  A separate final judgment which contains the amounts each claimant shall receive will be entered pursuant to Fed. R. Civ. P. 58.

So **ORDERED** and **SIGNED** this **13** day of **February, 2012.**

Ron Clark, United States District Judge

---

[13]Pursuant to Fed. R. Civ. P. 56(f)(1), the court has previously notified the parties of its intent to grant summary judgment in part for Brown based on *Downing*.  No party objected; however, Asamarbunkers reserved its right to appeal the *Downing* decision as applied to this case as they were not a party to the suit.  The court did not rely on *Downing* in its analysis of Asamarbunkers's claim.